The opinion below is hereby signed.   Dated: November
9, 2005.

_____
S. Martin Teel, Jr.
United States Bankruptcy Judge


UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| NETtel CORPORATION, INC., *et al.*, | ) | Case No. 00-01771 |
| | ) | (Chapter 7) |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| | ) | |
| WENDELL W. WEBSTER, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 02-10118 |
| SCOTT & REID GENERAL CONTRACTORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Invoking 11 U.S.C. §§ 547(b) and 550(a), the complaint in

this proceeding against Scott & Reid General Contractors, Inc.

("Scott & Reid") seeks to recover a pre-petition payment of

$129,508.36 made by the debtor, NETtel Corporation, Inc.

("NETtel"), to Scott & Reid.[1]  The plaintiff, Wendell W. Webster,
is the trustee of NETtel's estate under Chapter 7 of the
Bankruptcy Code.

Scott & Reid has moved for summary judgment, advancing three
theories why Webster is not entitled to recover the $129,508.36
transfer.  First, Scott & Reid asserts a contemporaneous exchange
for new value defense under 11 U.S.C. § 547(c)(1), contending
that the disputed transfer was made by the debtor in exchange for
Scott & Reid's release of a self-executing lien that arose under
Tex. Const. Art. XVI, § 37.  Second, Scott & Reid asserts a
defense under § 547(c)(6), arguing that the transfer is not
avoidable by Webster because, in return for the transfer, Scott &
Reid relinquished its right to perfect a statutory lien that
would have been enforceable against the trustee in this
bankruptcy case.  Third, Scott & Reid posits that Texas Property
Code § 162.001 required Scott & Reid to hold $105,944.94 of the
$129,508.36 transfer in trust for the benefit of its
subcontractors and suppliers.  Accordingly, it argues, Webster
cannot satisfy his burden under § 550(a)(1) to show that Scott &
Reid was an initial transferee of that portion of the transfer.
For reasons stated in more detail below, the court will deny

---

[1]  There are two debtors in these jointly administered
chapter 7 cases: NETtel Corporation, Inc. and NETtel
Communications, Inc.  The pertinent debtor here is NETtel
Corporation, Inc. and the use of "NETtel" will refer to only it.

Scott & Reid's motion.

The undisputed facts are as follows.

A. PAYMENT OF THE ALLEGED PREFERENTIAL TRANSFER

Scott & Reid is a general contractor operating in the State of Texas.  In March, 2000, NETtel representatives solicited price quotes for construction work to be performed at NETtel's office located at 16200 Addison Road, Addison, Texas (NETtel's Addison Road Facility), space leased by NETtel from the building's owner, Red Sea Group.

Scott & Reid submitted a bid to perform that work, based upon which NETtel issued a purchase order to Scott & Reid on April 3, 2000, for the purchase of construction management services, including electrical, mechanical, and fire protection (the "Purchase Order").  The Purchase Order provided that Scott & Reid would construct certain improvements at NETtel's Addison Road Facility, in return for which NETtel agreed to pay Scott & Reid all amounts due once the work was complete and 30 days after invoice.  The building's owner, Red Sea Group, was not a party to this agreement between NETtel and Scott & Reid.

Scott & Reid performed the work called for under the purchase order (the "NETtel Project"), and the work was accepted by NETtel.  Substantially all of the work was completed by April

15, 2000, and a "final clean" was performed on April 20, 2000.[2]
In accordance with the parties' agreement, Scott & Reid submitted
to NETtel an invoice, which was dated May 3, 2000, seeking
payment in the amount of $129,508.34.  NETtel did not pay the
invoice within the 30 days allotted by the invoice.  In a letter
dated August 22, 2000, from Scott & Reid's accounting office
directed to Jimmy Ellis, NETtel's Senior Director for Corporate
Real Estate and Facilities, the defendant urged NETtel to pay the
overdue invoice, stating in pertinent part:

> This invoice is now 70 days PAST DUE.  We ask that you
> forward payment for this invoice immediately.  We have
> contacted Cherly Holloway with the Red Sea Management
> Group on behalf of this invoice and have informed her
> that if we do not receive payment on this invoice
> before the end of the month we will have no other
> choice but **to place** a lien **on the building**.  This will
> cause great distress for the building owner as well as
> Scott & Reid....

[Emphasis added.]

On August 31, 2000, NETtel tendered a check to Scott & Reid
in the amount of $129,508.36 in satisfaction of the May 3, 2000
invoice.  Scott & Reid presented the check for payment on or
about September 7, 2000, and deposited those funds into its
general operating account.

---

[2]   Webster relies on documents (apparently produced by Scott
& Reid in discovery) which list a "final clean" of $466.22 (Pl.
Ex. 1 at SR 1014) and a date of performance of that work on April
20, 2000 (Pl. Ex. 2 at SR 1054).  Scott & Reid has not questioned
Webster's reliance on these documents.

NETtel filed a voluntary petition under Chapter 11 of the
Bankruptcy Code on September 28, 2000.  The case was converted to
a case under Chapter 7 on October 23, 2000, and Webster became
the trustee.

> B.   STEPS TAKEN BY SCOTT & REID TO SECURE OR PERFECT
>      STATUTORY OR CONSTITUTIONAL LIENS

Scott & Reid never perfected any statutory mechanic's lien
on NETtel's Addison Road Facility.  Although a threat was made in
the August 22, 2000 letter of placing a lien "on the building"
which would "cause great distress for the building owner," there
is no evidence in the record indicating that Scott & Reid and
NETtel discussed the possibility that Scott & Reid already held a
lien against NETtel's leasehold interest in the property or could
obtain a lien against that interest (as opposed to a lien against
the lessor's interest as owner of the building).  Scott & Reid
likewise never filed an affidavit with any state or local
government office purporting to perfect and give notice of any
lien it held against NETtel arising under the Texas Constitution.

> C.   PAYMENTS MADE BY SCOTT & REID TO THIRD PARTIES IN
>      CONNECTION WITH THE NETtel PROJECT

In support of its argument that it was a mere conduit in
receiving the payment from NETtel, Scott & Reid asserts that,
"based upon receipt of payment from NetTel, Scott & Reid paid
$105,991.94 to the subcontractors and suppliers who provided work
and/or materials under the Purchase Order."  The court later

rejects the mere conduit argument, as a matter of law, on the basis that Scott & Reid received the payment as a creditor. Unless that rejection of the argument is erroneous, the details regarding payments to subcontractors is academic, but the court will address them for the sake of completeness.

Scott & Reid has provided the following breakdown of the payments it allegedly made to its vendors in connection with the NETtel Project:

| Division | Vendor | Amount Paid |
|---|---|---|
| Permits | Town Addison | $492.25 |
| Dumpster | Bluebonnet | $297.68 |
| Final Clean | Make Ready | $466.22 |
| Misc. | AMEX | $813.77 |
| | Fedex/Courier | $101.40 |
| Millwork | Innovative Millwork | $17,950.00 |
| Glass/Glazing | Brian Kelly Glass | $4,764.00 |
| Doors/Frames | Atlas | $33.56 |
| | Paul Koep | $610.00 |
| | MK Red Sea & Assoc. | $2,686.77 |
| | Opening Specialties | $874.52 |
| Drywall | Taylor Construction | $17,175.00 |
| Carpet | PDL Designs | $15,290.50 |
| Wall Finishes | James House Paint | $5,935.00 |
| Marble/Stone | Euro Marble | $1,188.91 |
| Specialties | Accurate Fire | $595.00 |
| | B&W Sales | $1,369.36 |
| Fire Protection | Hartman Fire | $2,700.00 |
| Plumbing | Daum Plumbing | $2,360.00 |
| HVAC | Metro Mechanical | $11,650.00 |
| Electrical | Encompass Electrical | $18,638.00 |
| Total | | $105.991.94 |

Scott & Reid has not provided any contracts, invoices or checks (cancelled or otherwise) to support its allegation that the above-listed vendors were subcontractors or suppliers who

provided work or materials under the Purchase Order, nor has Scott & Reid provided documentation to evidence when and in what amount the alleged payments were made.  Instead, Scott & Reid relies solely on the Declaration of Nickolas Goettsch, in which Mr. Goettsch asserts (without additional support) that the above-listed vendors were subcontractors or suppliers who worked or provided materials on the NETtel Project, and that the stated amounts were paid to those vendors by Scott & Reid out of funds held in Scott & Reid's general operating account.  Webster, on the other hand, has submitted numerous invoices and checks produced to him during discovery that reflect payment by Scott & Reid to various vendors in connection with the NETtel Project.

Scott & Reid's alleged payments to vendors in connection with the NETtel Project can be divided into three relevant categories: (1) payments made by Scott & Reid before NETtel made the disputed transfer; (2) payments made by Scott & Reid subsequent to the disputed transfer; and (3) payments for which there is no documentary evidence establishing if and when the alleged payments were made.

According to exhibits submitted in conjunction with Webster's Opposition to Scott & Reid's Motion for Summary Judgment, the following payments totaling $37,055.12 were made by Scott & Reid <u>before</u> NETtel made the disputed transfer:

| Issue Date of Check | Payee | Amount Paid for NetTel Job |
|---|---|---|
| March 31, 2000 | Town of Addison | $442.25 |
| April 6, 2000 | Taylor Construction Services, Inc. | $7,978.50 |
| April 13, 2000 | Taylor Construction Services, Inc. | $4,243.50 |
| April 19, 2000 | Town of Addison | $50.00 |
| April 20, 2000 | Taylor Construction Services, Inc. | $1,527.75 |
| April 27, 2000 | PDL Designs | $14,890.50 |
| April 27, 2000 | Taylor Construction Services, Inc. | $1,527.75 |
| May 4, 2000 | Opening Specialties & Supply, Inc. | $874.52 |
| May 4, 2000 | Virginia Gonzalez, DBA Make Ready Plus | $466.22 |
| May 4, 2000 | Paul Koepp | $610.00 |
| May 4, 2000 | M.K. Red Sea & Associates, Inc. | $2,686.77 |
| May 12, 2000 | B&W Sales, Inc. | $1,369.36 |
| July 21, 2000 | PDL Designs | $388.00 |
| Total | | $37,055.12 |

Likewise, Webster's exhibits reflect that the following payments totaling $30,791.52 were made by Scott & Reid in connection with the NETtel Project _after_ NETtel made the disputed transfer:

9

| Issue Date of Check | Payee | Amount Paid for NetTel Job |
|---|---|---|
| September 7, 2000 | Daum Plumbing Co., Inc. | $2,124.00 |
| September 7, 2000 | Euro Marble & Granite, Inc. | $1,070.02 |
| September 7, 2000 | Hartman Fire Protection, Inc. | $2,430.00 |
| September 7, 2000 | James House Paint | $5,341.50 |
| September 7, 2000 | Metro Mechanical, Inc. | $10,485.00 |
| September 7, 2000 | Brian Kelly Glass & Mirror, Inc. | $4,287.60 |
| September 8, 2000 | Hartman Fire Protection, Inc. | $270.00 |
| September 8, 2000 | James House Paint | $593.50 |
| September 8, 2000 | Metro Mechanical, Inc. | $1,165.00 |
| September 8, 2000 | Brian Kelly Glass & Mirror, Inc. | $476.40 |
| September 8, 2000 | Taylor Construction Services, Inc. | $1,717.50 |
| September 8, 2000 | Daum Plumbing Co., Inc. | $236.00 |
| November 22, 2000 | Accurate Fire & Safety, Inc. | $595.00 |
| Total | | $30,791.52 |

Finally, Webster altogether disputes whether Scott & Reid made the following $38,145.30 in payments because they remain unsupported by documentary evidence, and there is nothing in the record to demonstrate when and out of what funds those payments were made:

| Innovative Millwork | $17,950.00 |
|---|---|
| Atlas Architectural Metals, Inc. | $33.56 |
| Taylor Construction Services, Inc. | $180.00 |
| Bluebonnet Waste Control | $279.68 |
| Encompass Electrical | $18,638.00 |
| AMEX | $813.77 |
| PDL Designs | $12.00 |
| Euro Marble & Granite, Inc. | $118.89 |
| Fedex/Courier | $101.40 |
| Total | $38,145.30 |

II

Scott & Reid has asserted affirmative defenses to Webster's avoidance powers under §§ 547(c)(1) and (6), and has likewise challenged Webster's ability to show that Scott & Reid was an initial transferee under §550(a)(1) with respect to a substantial portion of the disputed transfer.   The court will address each of these arguments in turn.

A.   SCOTT & REID HAS NOT MET ITS BURDEN TO SHOW THAT THE DISPUTED TRANSFER WAS MADE IN EXCHANGE FOR NEW VALUE

Scott & Reid contends that it released a self-executing lien arising under the Texas Constitution in exchange for the disputed transfer and that the payment is therefore immunized from Webster's avoidance powers.   As explained in more detail below, although Scott & Reid may have released a self-executing lien arising under the Texas Constitution at the time the transfer was

11

made, that lien would have been avoidable by Webster because it
was not perfected against a bona fide purchaser.  Moreover, even
if the lien would not have been avoidable by Webster, there
remain genuine issues of material fact with respect to the value
of the lien at the time of its release and whether or not the
parties intended the release as a contemporaneous exchange for
new value.  Accordingly, the court will deny Scott & Reid's
motion for summary judgment as to its § 547(c)(1) contemporaneous
exchange for new value defense.

Section 547(c)(1) embodies a "contemporaneous exchange for
new value" exception to a trustee's avoidance power under §
547(b) by providing that:

> The trustee may not avoid under this section a
> transfer--
> (1) to the extent such transfer was--
>     (A) intended by the debtor and the
> creditor to or for whose benefit such
> transfer was made to be a contemporaneous
> exchange for new value given to the debtor;
> and
>     (B) in fact a substantially
> contemporaneous exchange.

Thus, to prevail on a contemporaneous exchange for new value
defense, Scott & Reid must satisfy a three-part test, showing (1)
that it extended new value to the debtor, (2) that both parties
intended the alleged new value and reciprocal transfer by the
debtor to be contemporaneous, and (3) the exchange was in fact
contemporaneous.  5 Collier on Bankruptcy ¶ 547.04[1] (15th ed.
as revised March, 2003).  Furthermore, 11 U.S.C. §547(c)(1) will

12

only protect Scott & Reid to the extent the new value it

allegedly conferred upon the debtor was of equal or greater value

to the transfer.

> 1.  Scott & Reid released a constitutional lien
>     arising under Tex. Const. Art. XVI, § 37 at the
>     time of the transfer, but that release has not
>     been demonstrated to be new value.

Scott & Reid contends that it released a lien upon NETtel's

leasehold interest, and that this constituted new value.  It is

well established that the release of a mechanic's lien in

exchange for a pre-petition payment by a debtor may constitute a

contemporaneous exchange for new value, exempting such payment

from the trustee's avoidance powers notwithstanding that the

payment was made during the 90-day preference period.  See Gulf

Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil

Supply & Terminaling, Inc.), 837 F.2d 224 (5th Cir. 1988); Kenan

v. Fort Worth Pipe Co. (In re George Rodman, Inc.), 792 F.2d 125

(10th Cir. 1986); Lang v. Heieck Supply (In re Anderson Plumbing

Co.), 71 B.R. 19 (Bankr. E.D. Cal. 1986).  However, as explained

later, that principle is limited to liens which, prior to their

release, had been perfected against any subsequent transferee of

the property upon which the lien existed.

> a.  Scott & Reid had a lien under Tex. Const.
>     Art. XVI, § 37.

Texas Constitution Article XVI, § 37 provides that:

Mechanics, artisans and material men, of every class,
shall have a lien upon the buildings and articles made

13

> or repaired by them for the value of their labor done
> thereon, or material furnished therefor, and the
> Legislature shall provide by law for the speedy and
> efficient enforcement of said liens.

According to Scott & Reid, its release of a lien arising under the Texas Constitution at the time of the transfer immunizes the transfer from Webster's avoidance powers.  Although Scott & Reid never took any steps to perfect or record such a lien, it is well established that Tex. Const. Art. XVI, § 37 is unique from most if not all analogous provisions found in other state constitutions because it is self-executing.  <u>Ralph M. Parsons Co. v. South Coast Supply Co., Inc. (In re A & M Operating Co., Inc.)</u>,, 182 B.R. 997 (E.D. Tex. 1995) (providing an overview of Article XVI, § 37 and distinguishing it from similar provisions found in other state constitutions), <u>aff'd</u>, 84 F.3d 433 (5th Cir. 1996) (unpublished decision).  Indeed, under the Texas Constitution, a creditor is automatically protected by this provision and is not required to give notice or record the lien in order for it to take effect as between itself and the debtor.  <u>Id.</u>  There is no dispute that Scott & Reid furnished labor and material for the improvement of NETtel's Addison Road Facility for which NETtel remained indebted to Scott & Reid at the time of the transfer.  Thus, the court finds that Scott & Reid held a valid lien arising under the Texas State Constitution at the time of the transfer.

14

            b.    Scott & Reid, as lessee of the NETtel
                  Facility, qualifies as an "owner" within the
                  meaning of Tex. Const. Art. XVI, § 37.

     Webster asserts that no lien arose in Scott & Reid's favor

under Article XVI, § 37 of the Texas Constitution because the

provision only protects original contractors if they are in

direct privity with the "owner" of the property, and NETtel was

merely a lessee of the Addison Road Facility.  Indeed, courts

interpreting the statute have held that "[a]n original contractor

is 'a person contracting with an owner either directly or through

the owner's agent,' or 'one who deals directly with the owner,

with no middleman or contractor intervening.'"  Id.   Given that

Scott & Reid was not in direct privity with the fee simple

property owner, and in light of NETtel's status as a mere lessee

of the improved property, Webster concludes that Scott & Reid

cannot invoke the protections of Tex. Const. Art. XVI, § 37.

     Webster is correct that this provision of the Texas

Constitution can only be asserted by one in privity with the

"owner" of the property in question.  See id. at *5 (citing

cases).  The term "owner", however, as it is used in § 37, is

broadly construed to include not only fee simple owners, but also

leaseholders who cause improvements to be erected on property

owned by a third party.  Sumrall v. Russell, 255 S.W. 239 (Tex.

Civ. App. 1923, writ dism'd w.o.j.).  Accordingly, and because

Scott & Reid was in direct privity with NETtel, NETtel's status

                              15

as a lessee does not defeat Scott & Reid's right to invoke Tex.

Const. Article XVI, § 37 in its favor.

> c.   The Tex. Const. Art. XVI, § 37 lien held by
>      Scott & Reid was valid against NETtel at the
>      time of the transfer but its release was not
>      new value as the lien was unperfected.

Webster's remaining objection to Scott & Reid's

contemporaneous exchange for new value defense based upon the

release of an Article XVI, § 37 lien is that such liens expire

unless the lienholder files an affidavit pursuant to Texas

Property Code Section 53.052 no later than the fifteenth calendar

day of the fourth month after accrual of the debt (hereinafter

the "accrual period").  Nothing in Section 53.052, however,

prevents the holder of an Article XVI, § 37 lien who does not

file an affidavit from asserting such a lien against the original

owner after expiration of the accrual period.  Instead, Section

53.052 requires a debtor to file a lien affidavit within the

accrual period in order to make the self-executing lien arising

under Article XVI, § 37 of the Texas Constitution enforceable

against a subsequent bona fide purchaser without actual notice.

See McEvoy v. Ron Watkins, Inc., 105 B.R. 362, 365 (N.D. Tex.

1987).  Webster is correct, however, that the failure to file a

lien certificate raises issues as to the new value defense.

Although the lien remained in place despite failure to file

a lien certificate, its unperfected status against a subsequent

bona fide purchaser has the consequence that Webster could avoid
the lien.  11 U.S.C. § 544(a)(3) places a bankruptcy trustee in
the position of a hypothetical bona fide purchaser.  There is no
indication on this record that a hypothetical bona fide purchaser
would have been put on actual notice of Scott & Reid's
constitutional lien, and Scott & Reid never timely filed an
affidavit of lien to perfect its lien by giving constructive
notice to a bona fide purchaser of NETtel's leasehold interest.
Thus, Webster could avoid the lien.

That Webster could avoid the lien requires the further
conclusion that Scott & Reid conferred no new value on NETtel by
releasing the lien.  Section 547(a)(2) defines "new value" as
including a "release by a transferee of property previously
transferred to such transferee in a transaction that is neither
void nor voidable by the debtor or the trustee under any
applicable law . . . ."  The involuntary imposition of a lien by
operation of law constitutes a transfer of property.  11 U.S.C. §
101(54) (defining "transfer" as including voluntary or
involuntary disposition of or parting with an interest in
property).  Because the lien could be avoided by Webster standing
in the shoes of a hypothetical bona fide purchaser under §
544(a)(3), the release of the lien by Scott & Reid did not
constitute new value.

17

Indeed, resort to § 544(a)(3) is unnecessary to reach the conclusion that no new value was exchanged. The lien could not be viewed as "previously transferred" within the meaning of the definition of new value in § 547(a)(2) because a transfer of an interest in real property for purposes of § 547 is deemed to have occurred on the petition date in the case of a transfer that was never perfected. See §§ 547(e)(1)(A) (defining perfection in the case of real property) and 547(e)(2) (providing that an unperfected transfer is deemed to take place on the petition date).

Scott & Reid could be viewed as releasing whatever right it had to perfect its lien, but under § 547(a)(2) that release cannot constitute "new value" as a release of property previously transferred to Scott & Reid, nor can it constitute "new value" as "money or money's worth in goods, services, or new credit."

> d.   Even if a release of the right to perfect a lien could be viewed as new value, an issue remains whether the lien remained susceptible to perfection on the date of the transfer.

Even if the release of an unperfected lien that could be perfected could constitute new value, the record is unclear regarding when the deadline to perfect Scott & Reid's lien expired. The parties suggest different methods for computing the accrual period under § 53.052(a). According to Webster, accrual of indebtedness should be determined by reference to the date

18

substantially all of the work was completed (April 15, 2000) or
when the final clean was performed (April 20, 2000).  Thus,
according to Webster, the accrual period began to run no later
than April 20, 2000.  If the debt did, in fact, accrue on April
20, 2000, the accrual period for recording the lien would have
expired on August 15, 2000, almost two weeks prior to the
transfer. <u>See</u> Trustee's Opp'n at 10 n. 3.

Scott & Reid, on the other hand, argues that accrual of
indebtedness should be determined by reference to the date upon
which Scott & Reid issued its final invoice to NETtel.  In
support of its position, Scott & Reid relies on Texas Property
Code § 53.053(b)(2), which defines an original contractor's
"accrual of indebtedness" as "the last day of the month in which
the original contract has been completed, finally settled, or
abandoned."  According to Scott & Reid, the contract in this case
was "completed" when Scott & Reid tendered its invoice to NETtel
on May 3, 2000.  Using these dates, Scott & Reid would have had
until September 15, 2000, to file a lien affidavit and perfect
its constitutional lien as against bona fide purchasers.

The statute clearly defines "completion" of an original
contract as "the actual completion of the work, including any
extras or change orders reasonably required or contemplated under
the original contract, other than warranty work or replacement or
repair of the work performed under the contract."  Tex. Prop. §

19

53.001(15).[3]  Thus, the court concludes as a matter of law that
the contract between the parties was "completed" within the
meaning of § 53.053(b)(2) upon the completion of the work to be
performed under the contract, not when Scott & Reid issued the
invoice.[4]  Regarding the date of completion, however, the
parties' statements of material facts (and the exhibits attached
to them) fail to establish when the work was complete.  Webster
argues that as of April 15, 2000, substantially all of the work
had been completed and that a "final clean" occurred on April 20,
2000.  Substantial completion does not qualify as "completion of
the contract" under the statute, and the court is unclear whether
the "final clean" was the last work completed.  See 3 Tex. Prac.
Guide Real Estate Litig. § 10:142 (2005) (describing substantial

---

[3]  Scott & Reid cites Keystone Pipe & Supply Co. v. Wright,
37 S.W.2d 227, 230 (Tex. App. 1931), for the proposition that
indebtedness has "accrued" under the statute when the debt
becomes "due."  The court's use of the term "due" in Keystone was
apparently meant to refer to when the materials at issue were
delivered as the statute it looked to deemed accrual to occur "at
the date of the last delivery of such material."  Section
53.053(b)(2), by explaining exactly how and when debt accrues,
contemplates that a debt first becomes "due" when the work under
the contract is completed (or when the contract is "finally
settled" or "abandoned"), and not upon the issuance of an
invoice.

[4]  Scott & Reid does not contend that the accrual of its
lien runs from some date on which its contract with NETtel was
"finally settled" or "abandoned" within the meaning of §
53.053(b)(2).  Scott & Reid concedes that NETtel accepted the
completed work, and thus there was no dispute requiring a
settlement of the contract between the parties, and obviously
there was no abandonment.

completion as work that "is sufficiently complete that the owner
takes possession and the contractor is given a 'punchlist' of
minor items to complete").  However, as the party bearing the
burden of showing that § 547(c)(1) applies, Scott & Reid suffers
the consequences of the date of completion of work being not
established.  For that reason, it is not entitled to summary
judgment as to its defense that release of the constitutional
lien constituted new value under § 547(c)(1).

> 2.   Scott & Reid has not met its burden to establish
> the value of the released lien or that the parties
> intended the release as a contemporaneous exchange
> for new value.

Even if Scott & Reid showed that the release of the lien
somehow constituted new value, it has failed for two additional
reasons to show that § 547(c)(1) applies.

"The critical inquiry in determining whether there has been
a contemporaneous exchange for new value is whether the parties
intended such an exchange . . . . [and] [t]he determination of
such intent is a question of fact."  In re Spada, 903 F.2d 971,
975 (3d Cir. 1990)(internal quotations and citations omitted).
If one party to the exchange is unaware that the other party
believes it is exchanging something of value, such as the release
of a lien, this shows that no contemporaneous exchange was
intended.  In re Gateway Pacific Corp., 153 F.3d 915, 918 (8th
Cir. 1998) (debtor's lack of knowledge regarding security

21

interest that preference action defendant purports to have
released at time of disputed payment belies assertion that a
contemporaneous exchange was intended).

Although Scott & Reid thoroughly briefed the question of
whether it released a lien arising under the Texas Constitution
at the time of the transfer, Scott & Reid neglected to address
whether the parties intended that the transfer be in exchange for
this alleged new value. There is little, if anything, in the
record to support a finding that the parties intended the
transfer to be in exchange for a release of a self-executing
constitutional lien.[5] Indeed, the record strongly supports the
inference that neither party was even aware that Scott & Reid
possessed lien rights arising under the Texas Constitution until
this dispute arose, which belies any suggestion that the parties
intended such a contemporaneous exchange for new value at the
time the transfer was made. A contemporaneous exchange for new
value defense cannot be supported by _post_ _hoc_ legal rationales as

---

[5]   In its Statement of Material Facts to Which There is no
Genuine Dispute, Scott & Reid asserts that "[a]fter repeated
demands for payment, which included communications from Scott &
Reid that it would enforce its Texas lien rights as the original
contractor, NETtel tendered a check in the amount of $129,508.36
dated August 31, 2000 to Scott & Reid for payment of the
Invoice." SOMF ¶ 7.  Scott & Reid has not alleged, however, that
the parties communicated specifically about a self-executing lien
arising under the Texas Constitution.  Rather, all allegations
and references in the record to Scott & Reid's "Texas lien
rights" are general, and could just as easily (if not more
likely) refer to the statutory mechanics lien that Scott & Reid
could have perfected, but did not, against NETtel.

to how a creditor may have unwittingly, and without the debtor's knowledge, conferred new value upon a debtor in exchange for a pre-petition payment.[6]

Scott & Reid has also failed to show with sufficient specificity that the self-executing constitutional lien it allegedly released in exchange for the disputed transfer was of equal or greater value to the transfer.[7] Scott & Reid's rights with respect to the improved property cannot exceed the rights of NETtel in that property. Because NETtel had only a leasehold interest in the NETtel Addison Road Facility, it follows that any lien that could have been asserted by Scott & Reid against NETtel was equally limited. See Stolz v. Honeycutt, 42 S.W. 3d 305, 310 n. 1 (Tex. App. 2001) ("generally when a lessee contracts for construction, the mechanic's lien attaches only to the leasehold interest, not to the fee interest of the lessor.")(internal quotations omitted). It is unclear by what yardstick the court should measure the value of a lien that extended only to NETtel's

---

[6] Scott & Reid has not contended that § 547(c)(1) applies to the release of its right to pursue a statutory lien. Even as to that lien, the threat made in the August 22, 2000 letter could be construed as threatening to file a lien against the owner of the building, not against NETtel's leasehold interest, and the record does not demonstrate that NETtel understood that a statutory lien could be asserted against its leasehold interest.

[7] Scott & Reid's argument in support of its contemporaneous exchange for new value defense presumes, without providing any evidentiary support, that the value of any lien it held or could have perfected against NETtel was equal in value to the transfer.

leasehold interest in the property--a leasehold interest that may
have been subject to expiration or termination at any time.
Although not addressed by either party in these proceedings, the
record in this case reflects that Webster rejected at least one
portion of the lease or leases held by NETtel at 16200 Addison
Road.  See Trustee's Emergency Motion to Reject Executory
Contracts and Unexpired Non-Residential Leases (DE No. 236, filed
December 15, 2000); Objection by Creditor Red Sea Group Addison,
L.P., to Trustee's Motion for an Order Extending Time to Assume
or Reject Unexpired Leases of Nonresidential Real Property (DE
No. 245, filed December 19, 2000); Order Partially Granting
NETtel's Motion to Reject Executory Contracts and Unexpired Non-
Residential Leases (DE No. 264, entered December 26, 2000).
Although the relevant inquiry for purposes of this analysis is
the value of the lien at the time of the transfer, not the
petition date or the date of rejection, Webster's ultimate
rejection of some if not all of NETtel's leasehold interest in
16200 Addison Road may at least partially reflect the value of
that leasehold to NETtel during the preference period, at which
time NETtel is presumed to have already been insolvent.  Although
Scott & Reid has demonstrated that it held a valid lien against
Scott & Reid at the time of the transfer, it has offered no
evidence to demonstrate that the value of the lien released was
of equal or greater value to the transfer.  Absent a showing of

24

the value of the lien claimed to have been released, the defendant cannot prevail on its § 547(c)(1) defense.

For all of the reasons stated above, Scott & Reid's motion for summary judgment will be denied to the extent it is based on a contemporaneous exchange for new value defense under § 547(c)(1).

B.   THE COURT CANNOT GRANT SUMMARY JUDGMENT WITH RESPECT TO SCOTT & REID'S 547(c)(6) DEFENSE

In a one-paragraph footnote to its motion for summary judgment, Scott & Reid asserts a defense to Webster's avoidance powers under § 547(c)(6).  Scott & Reid contends that because it relinquished its right to file or perfect a statutory mechanic's lien under Texas Property Code § 53.001 et seq. when the disputed payment was made, the transfer is not subject to Webster's avoidance powers because such relinquishment constitutes the "fixing of a statutory lien that is not avoidable under Section 545 of the Bankruptcy Code" within the meaning of § 547(c)(6).  See Cimmaron Oil Co., v. Cameron Consultants, Inc., 71 B.R. 1005, 1010-11 (N.D. Tex. 1987) (defendant's loss--resulting from payment of the claim by the debtor--of right to perfect a statutory lien comes within § 547(c)(6)).  Although Scott & Reid did not raise § 547(c)(6) with respect to its constitutional lien, the same issue applies as a constitutional lien would be treated as a statutory lien for purposes of § 547(c)(6).

25

The plain language of § 547(c)(6) offers immunity from a
trustee's preference avoidance power only to those creditors who
actually fixed a statutory lien during the preference period, and
not to those who merely had, but did not exercise, the statutory
right to perfect such a lien, and thus the rationale of Cimmaron
is in error.  See Rand Energy Co. v. Strata Directional Tech.,
Inc. (In re Rand Energy Co.), 259 B.R. 274, 276 (Bankr. N.D. Tex.
2001) (following Cimmaron as binding precedent, but questioning
its rationale);  Cocolat, Inc. v. Fisher Dev., Inc. (In re
Cocolat, Inc.), 176 B.R. 540, 549 (Bankr. N.D. Cal. 1995)
("Notwithstanding Cimmaron and Nucorp, the Court is skeptical
that the language of § 547(c)(6) should be strained to apply to
payments on a statutory lien, rather than the 'fixing' of the
lien itself."); Simon v. Engineered Protection Sys., Inc., 91
B.R. 782, 786 (N.D. Ohio 1988) ("The characterization of
satisfaction of a statutory lien as an exception to preference
avoidance is nebulous.  Case law excepting satisfaction of such
liens is based on the assumption that payment merely avoids the
bite of a lien which the trustee could not have attacked.
However, legislative history reveals a broadening of the
exception to include satisfaction of such liens was deleted
before passage of the final bill.").  The court thus rejects
Scott & Reid's argument that § 547(c)(6) applies not only to
fixed liens, but also to the relinquishment of the right to fix a

lien.

As <u>Rand</u> notes, however, the right to fix a statutory lien is
not necessarily irrelevant to a § 547 claim.  The existence of
that right may have relevance for purposes of applying §
547(b)(5), an evaluation of whether the payment to the creditor
enabled the creditor to receive more than it would receive if the
payment had not been made and the creditor received payment
within a chapter 7 bankruptcy case "to the extent provided by the
provisions of this title."  In making that hypothetical
evaluation, <u>Rand</u> reasons, the court may take account of the
creditor's right to fix a statutory lien which would, in the
hypothetical, not have been relinquished by way of the debtor's
payment of the debt.  If the payment had not been made, and had
the right to perfect the statutory lien been timely exercised,
that lien would have been unavoidable by the trustee as a
preference by reason of § 547(c)(6) and would, as a transfer
effective against a bona fide purchaser of real property, be
unavoidable by the trustee under § 544(a)(3).  See <u>Cocolat</u>, 176
B.R. at 546 ("[I]t is safe to assume that, had the $10,000
Payment not been made, this portion of the debt would have been
included in [the creditor's] mechanic's lien claim [which was
filed for other, unpaid portions of the debt].").

As previously addressed in <u>Webster v. E.I. Kane Constr, Inc.
(In re NETtel Corp.)</u>, 2004 WL 3130571 (Bankr. D.D.C. 2004), the

27

Rand approach of allowing § 547(c)(6) to apply hypothetically
through the back door of § 547(b)(5) would raise the question of
whether the creditor was acting in a commercially reasonable
manner by not perfecting the lien sooner,[8] and likewise would
necessitate an inquiry into whether the creditor would have
actually perfected absent payment.

The court expressed doubts about Rand, and elaborates on
them further below, but again finds it unnecessary to resolve
whether Rand should be followed.

First, the statute has not plainly invited the speculative
inquiry Rand demands, as it could be read as constructing the
hypothetical recovery by the creditor based on the facts as they
exist on the petition date with the exception that the payment
was not made.

Second, it could be further argued that permitting a
hypothetical prepetition perfection of the lien and hypothetical
assertion of the § 547(c)(6) defense does not make sense given
the burdens of proof under § 547(g).  If Rand is followed, the
party bearing the burden of proof under § 547(g) to prove the
avoidability of the transfer under § 547(b) is the trustee, and
he would bear the burden of proof on Rand's speculative inquiry

---

[8]  Commercially unreasonable delay in perfecting the lien
may indicate that the lien would not actually have been perfected
had the payment not been made.

28

regarding whether the creditor would have perfected its lien such that the lien would be unavoidable under § 547(c)(6).  However, § 547(g) casts on the creditor the burden of proving unavoidability by virtue of § 547(c), and Rand seems to produce an alteration of burdens that is inconsistent with § 547(g).

Third, the Rand approach does not partake as speculative a character when the creditor's right to perfect its lien has not expired as of the petition date, and the creditor could perfect the lien postpetition (assuming the payment had not been made) pursuant to 11 U.S.C. §§ 362(b)(3) and 546(b).  Assuming that a creditor in that position should be allowed the benefit of Rand's approach, an argument in favor of applying Rand in all cases is this: when the time to perfect a lien has expired prepetition, the avoidability of a payment to the creditor ought not turn on the fortuity of whether the bankruptcy case commenced immediately after the payment was made (and while the time to perfect a lien had not expired) or commenced only once the time to perfect a lien had expired.  On the other hand, in many cases, § 547(c)(2) (the so-called ordinary course of business defense) would apply to a payment to a general contractor that is made in a commercially reasonable time, and the creditor would not need to file a lien prior to the payment to immunize the payment from a preference attack.  Once the payment occurs on a date after which payment would not enjoy the shield of § 547(c)(2), the creditor

arguably has only itself to blame for not filing a lien to protect itself under § 547(c)(6), and for subjecting itself to the risk that the time to perfect will have expired before the petition date.

The court need not decide whether to follow <u>Rand</u>.  Even assuming that Scott & Reid would have filed an affidavit of lien immediately had it not received the NETtel payment when it did, Scott & Reid has not demonstrated that § 547(b)(5) cannot be met. First, the § 547(b)(5) evaluation would ask what would be received pursuant to the lien on the date of the bankruptcy petition, <u>Cocolat</u>, 176 B.R. at 546, and the record, as discussed with respect to the § 547(c)(1) defense, does not permit the court to ascribe a value to Scott & Reid's lien.  Second, as discussed with respect to § 547(c)(1), Scott & Reid has not demonstrated the perfectability of the lien on the date of the disputed transfer.[9]  Accordingly, summary judgment on this ground must be denied.

C.   SCOTT & REID IS UNABLE TO SHOW THAT IT WAS A MERE CONDUIT FOR A PORTION OF THE DISPUTED TRANSFER THAT IT HELD IN TRUST FOR THE BENEFIT OF ITS SUBCONTRACTORS AND SUPPLIERS

Scott & Reid asserts that $105,991.94 of the disputed transfer is not avoidable by Webster because it was impressed

---

[9]  Scott & Reid's statutory lien, like its constitutional lien, could be perfected only by filing an affidavit of lien by the deadline set by § 53.053(b)(2).

30

with a trust pursuant to Texas Code Section 162.001, which

provides, in pertinent part:

> (a) Construction payments are trust funds under
> this chapter if the payments are made to a contractor
> or subcontractor or to an officer, director, or agent
> of a contractor or subcontractor, under a construction
> contract for the improvement of specific real property
> in this state.

Thus, argues Scott & Reid, it was a mere custodian of the portion

of the transfer that it was legally bound to hold in trust for

its subcontractors and suppliers, and as such cannot be deemed an

initial transferee from whom Webster is entitled to recover those

funds under § 550(a)(1).

1.

Courts have held that an individual is not an initial

transferee where the individual functions as a mere conduit

between the debtor and a third-party.  E.g., Lowry v. Security

Pac. Bus. Credit, Inc. (In re Columbia Data Products, Inc.), 892

F.2d 26, 28 (4th Cir. 1989); Bonded Financial Servs., Inc. v.

European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988).  Moreover,

where an initial recipient or payee has no dominion or control

whatever over the funds transferred, the recipient will not be

liable under § 550(a)(1) as an initial transferee even if the

trustee establishes all other necessary elements of a preference

action.  E.g., Christy v. Alexander & Alexander of New York, Inc.

(In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson

& Casey), 130 F.3d 52 (2d Cir. 1997) (insurance agent not
transferee); Luker v. Reeves (In re Reeves), 65 F.3d 670 (8th
Cir. 1995) (corporate shell not transferee); Malloy v. Citizens
Bank of Sapulpa (In re First Sec. Mortg. Co.), 33 F.3d 42 (10th
Cir. 1994) (bank receiving deposit not transferee); Kaiser Steel
Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.), 110 B.R.
514 (D. Colo. 1990) (brokerage firm not transferee); Gropper v.
Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.), 33 B.R. 334
(Bankr. S.D.N.Y. 1983) (law firm maintaining escrow account not
transferee); 5 Collier on Bankruptcy ¶ 550.02[4][a] (15th ed.
rev. 2002).

Courts have held that because funds subject to statutory
trusts under Texas Property Code § 162.001 or similar statutes
are not property of a general contractor, payments to
subcontractors by the general contractor are immunized in the
general contractor's bankruptcy case from the bankrupt trustee's

avoidance powers.[10]  None of these decisions, however, involved a

bankruptcy trustee's attempt to avoid a transfer of property of

the bankruptcy estate (funds owned by the debtor-owner of the

property being improved) that was made to extinguish an

obligation to a general contractor.  In other words, the

decisions are distinguishable because here property of the estate

plainly was transferred to Scott & Reid.  Moreover, Scott and

Reid has cited no decision in which an owner's payment **to a**

**general contractor** was held to be a payment **to a mere conduit**,

and such decisions would be expected to exist if Scott and Reid's

theory had any validity.

---

[10]  See  Cunningham v. T&R Demolition, Inc., (In re ML &
Associates, Inc.), 301 B.R. 195 (N.D. Tex. 2003) (relying upon
Boyle v. Abilene Lumber, Inc. (In re Boyle), 819 F.2d 583, 586
(5th Cir. 1987), court concludes that § 162.001(a) of the Texas
Property Code treats payments made to a general contractor under
a construction contract as trust funds and the subsequent
payments to the subcontractor were never property of the general
contractor--within the meaning of § 547(b)--to the extent the
payments could be traced); In Greenwald v. Square D. Co., In re
Trans-End Technology, 288 B.R. 181 (Bankr. N.D. Ohio 1998)
(holding that trustee of general contractor's bankruptcy estate
was not entitled to recover from subcontractor funds that were
held in trust by general contractor pursuant to Michigan Building
Contract Fund Act); Selby v. Ford Motor Co., 590 F.2d 642 (6th
Cir. 1979) (stating that "the beneficial interests of
subcontractors and materialmen in a building fund should not be
regarded as the property of the bankruptcy debtor, at least so
long as the beneficial interests are traceable" and going on to
find that the tracing issue created no problem because the "funds
subject to the statutory trust were paid to the subcontractor as
trust beneficiaries prior to bankruptcy."); In re D&B Electric
Inc., 4 B.R. 263 (Bankr. W.D. Ky. 1980), rejected by Commonwealth
of Kentucky v. Laurel County, 805 F.2d 628 (6th Cir. 1986), cert.
denied, 484 U.S. 817 and 818 (1987).

This court has rejected the theory.  As this court explained
in Webster v. E.I. Kane Constr., Inc. (In re NETtel Corp., Inc.),
2004 WL 3130571 (Bankr. D.D.C. 2004), an owner's payment to a
general contractor is compensation for work performed by the
general contractor as prime contractor.  That the payment is made
prior to certain subcontractors being paid does not alter the
payment as compensation to the general contractor for work
performed by the general contractor (albeit through the use of
subcontractors).  Such a general contractor is not a mere conduit
even though it holds the funds in trust to the extent necessary
to pay subcontractors.  This follows because, as explained in
Lowry v. Security Pacific, 892 F.2d at 28, "[w]hen a creditor
receives money from its debtor to pay a debt, the creditor is not
a mere conduit.  See In re Chase & Sanborn Corp., 848 F.2d 1196,
1120 (11th Cir. 1988)."  This point was made as well in perhaps
the leading case on the mere conduit defense.  See Bonded
Financial Services, 838 F.2d at 893 (the defendant "received
nothing from [the debtor] that it could call its own; the
[defendant] was not [the debtor's] [creditor....]".

Payments by an owner to a general contractor have a
meaningful benefit to the general contractor even when the funds
upon receipt are held in trust to pay subcontractors.  They
constitute income to the general contractor and have a positive
impact on its balance sheet by enabling it to have funds on hand

34

with which to pay its unpaid subcontractors.[11]   Scott & Reid was

thus no mere conduit upon receiving the payment from NETtel.

2.

Even if Scott & Reid's mere conduit theory could be upheld,

Scott & Reid would be required to trace the payments made to

subcontractors as having come from the trust fund.   Scott & Reid

deposited the disputed transfer in its general operating account.

Because the trust funds were held in and paid out of a co-mingled

rather than a segregated account, Scott & Reid can only prevail

on its mere conduit defense if it can trace the funds paid to its

subcontractors and suppliers to the funds impressed with the

162.001 Texas Property Code trust, a difficult, although not

necessarily impossible, task.   See Begier v. IRS, 496 U.S. 53

(1990) (holding that to trace funds impressed with a 26 U.S.C. §

7501 statutory trust that were paid out of a co-mingled account,

it is necessary to demonstrate a sufficient nexus between the

amount held in trust and the funds ultimately paid on the

obligation for which the funds were held in trust); Drabkin v.

---

[11]   If a general contractor endorses a check from the owner
to a subcontractor, with the moneys never passing through its
bank account, the result is the same, namely, a direct benefit
conferred on the general contractor by enabling it to rid itself
of debts to its subcontractor.   That final effectuation of that
benefit (via actual payment to the subcontractor) is delayed if
the funds are instead deposited into the general contractor's
bank account with a statutory trust attaching does not alter the
existence of a benefit arising upon the payment to the general
contractor.

District of Columbia, 824 F.2d 1102, 1115 (D.C. Cir. 1987)
(reasonable assumptions should be employed to aid efforts to
trace funds to a trust). Scott & Reid has not attempted to trace
the funds, nor have the parties briefed the issue of how such
tracing might be accomplished given that Scott & Reid did not
segregate the funds.[12] Notwithstanding Scott & Reid's failure to
address the tracing issue, it is worth noting that Scott & Reid
paid at least $37,055.12 of the obligation it allegedly owed its
subcontractors and suppliers before the disputed transfer was
made and before any trust could have arisen under the statute.
Scott & Reid cannot, as a matter of law, trace these funds to the
funds held in trust. The portion of the transfer that would have
been held in trust by Scott & Reid for the benefit of its
subcontractors and suppliers had the obligation not already been
satisfied by Scott & Reid was a payment from NETtel to Scott &
Reid, not to Scott & Reid as trustee on behalf of the already
paid subcontractors and suppliers.

---

[12] Scott & Reid has also failed to establish that the list
of vendors it allegedly paid were subcontractors on the NETtel
project, such that payments to those vendors would fall within
the protective umbrella of Tex. Prop. § 162.001. For example,
Scott & Reid has included a payment to AMEX (presumably an
abbreviation of "American Express") in its list of payments made
to subcontractors and suppliers, yet Scott & Reid has offered no
explanation (although one may very well exist) why such payment
to a lender or credit institution qualifies as a payment to a
subcontractor or supplier.

III

For all of the reasons stated above, the court will deny
Scott & Reid's motion for summary judgment.

[Signed and dated above.]



Copies to:

All counsel of record; Office of the United States Trustee.